UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| United States of America | |
|---|---|
| *v.* | Criminal No. 3:07cr262 (JBA) |
| Anthony Schovanec, a.k.a. "Tone" | |

**RULING ON MOTION TO SUPPRESS**

Defendant Anthony Schovanec has moved to suppress testimony regarding a cooperating witness's out-of-court identification of him in connection with controlled purchases of crack cocaine in September 2007, as well as the photo arrays used and any in-court identifications. The Court granted the Defendant's request for a hearing, pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to evaluate the suggestiveness of the identification procedures and the reliability of the cooperating witness's ("CW") independent identifications of the Defendant. Based on the evidence presented during the *Wade* hearing, the Court concludes that, regardless of whether the identification was the result of an unduly suggestive process, the identification evidence is clearly sufficiently reliable to be admissible based on the CW's prior acquaintance with the Defendant. Therefore, the Motion to Suppress [Doc. # 29] is denied.

**I.     Factual Background**

The indictment in this case charges Anthony Schovanec (a.k.a. "Tone") with three counts of possession with intent to distribute, and distribution of, cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), encompassing conduct on September 25, 26, and 28, 2007. In each count, the quantity of crack cocaine at issue is less than five grams. The indictment also contains a forfeiture allegation.

The basic facts adduced at the *Wade* hearing, held on April 8 and 15, 2008, are as follows. On May 17, 2007, the Waterbury Police Department ("WPD") utilized a CW to make a controlled purchase of crack cocaine from a dealer known as "Nana" at 34 Hickory Street in Waterbury. The CW was familiar with that location because, before her cooperation with the WPD began, she had purchased crack there from Nana (or from whoever answered the door) for her personal use. WPD officers confirmed that Nana was in fact Johanna Rivera by showing the CW a photo array featuring Rivera.[1] As she was completing this transaction in May 2007, the CW, who was wearing an audio recording device, encountered the Defendant. The recording makes evident that the CW and the Defendant were already familiar with each other, as illustrated by their exchange upon seeing each other:

[CW]: Mira. Yo.

[Defendant]: What's going on? How are you?

[CW]: Fine. I didn't recognize you. Damn, you got fat.

(Tr., May 17, 2007, Gov't's Ex. 4a, at 1.) As the CW explained during the hearing, she was referring here to the fact that Schovanec had gained weight since the last time she had talked to him. Previously, they had resided (albeit without interacting directly) at the same halfway house and had seen each other socially through the CW's boyfriend.

Later, in September 2007, the CW returned with the WPD to 34 Hickory Street to make another controlled purchase from Rivera. The CW's prior familiarity with Defendant was further suggested by the recording from the transaction on September 25 when she, again equipped with an audio recording device and cash, approached the multi-unit house

---

[1] This May 2007 photo array is not the subject of Defendant's Motion to Suppress.

at 34 Hickory Street and encountered an unknown male outside. The CW asked this person if Nana was home, to which the male responded that she was not, but that "[h]e's home"; the CW then said "I know him . . . I know Tom." The CW walked up to the front door of the house and signaled that she wanted to purchase drugs by stomping her foot; in response to this, the Defendant opened the door. The two had a short conversation which touched on the CW's recent jail sentence and that of her former boyfriend. As the transcript demonstrates, the Defendant knew the CW well enough to be familiar with her boyfriend's nickname, "Buddha":

    [CW]:          Hi.

    [Defendant]:    What's going on?

    [CW]:          Um, do you got fifteens?

    [Defendant]:    No. I only got twenties.

    [CW]:          Twenties only. How much you give me for a hundred?

    [Defendant]:    Give you six.

    [CW]:          I was locked up, yo.

    [Defendant]:    For real?

    [CW]:          Oh yeah. Buddha is locked up to[o].

    [Defendant]:    For real?

    [CW]:          Yup. He's coming this month. Next week.

    [Defendant]:    Coming to visit . . .

    [CW]:          I got to go.

    [Defendant]:    [. . .] you?

    [CW]:          Huh?

> [Defendant]: Coming to visit you?
>
> [CW]: I don't know. I don't mess with him.
>
> [Defendant]: Oh. (Laughter)

(Tr., Sept. 25, 2007, Gov't's Ex. 1a, at 2–3.) They then completed the crack transaction quickly and smoothly.

After completing the purchase, the CW returned to the WPD officers waiting in a vehicle nearby and indicated from whom she had purchased crack. She again called him "Tom"—as she had to the man outside 34 Hickory Street—and confirmed that this was the same person the officers knew as "Tone." According to the audio recording, the CW and the WPD officers had the following exchange about the transaction:

> [Officer #2]: All right. What happened, she wasn't there?
>
> [Officer #1]: That's our guy.
>
> [CW]: Who?
>
> [Officer #2]: She wasn't there?
>
> [CW]: Tom.
>
> [Officer #2]: Nana wasn't there?
>
> [CW]: She wasn't.
>
> [Officer #2]: Who served you up?
>
> [CW]: Tom.
>
> [Officer #2]: Tom? Her boyfriend?
>
> [CW]: Yup.
>
> [Officer #2]: The little dude that we saw, saw there last time?
>
> [CW]: Yeah.

[Officer #2]: O.K. "Tone," right?

[CW]: Yeah, "Tone." I call him "Tom."

[Officer #2]: The little guy. The little mushier guy that was there last time?

[CW]: Yeah.

(Tr., Sept. 25, 2007, Gov't's Ex. 1a, at 4–5.)

Subsequently, the CW participated in two more controlled transactions—on September 26 and 28—under similar circumstances, each time buying crack cocaine from a person she called "Tom." Although the latter two transactions were short, the recordings of them further establish her familiarity with the Defendant. From the final encounter on September 28:

[Defendant]: What up, ma.

[CW]: I came too early?

[Rivera]: Damn.

[Defendant]: No. You straight.

[Rivera]: Who is it?

[Defendant]: That's my home-girl.

[Defendant]: There you go baby. Be careful baby when you're outside, all right?

[CW]: O.K.

[Defendant]: All right.

(Tr., Sept. 28, 2007, Gov't's Ex. 3a, at 3.)

After each of the three transactions, the CW returned to the nearby police vehicle and identified the seller using a photo array. The photo array process was roughly the same

5

every time: the officers showed the CW booking photographs of six young males (Schovanec and five others, all with similar facial features and skin tone); the photographs contained identifying information about the subjects which may or may not have been covered up; and without coaching, the CW selected the Defendant as the offender. Schovanec challenges these arrays as rushed, orchestrated shortcuts of formal array procedures in which the CW was not given time to carefully review the photographs and come to her own conclusion.

## II. Discussion

### A. Legal Principles

The Defendant has challenged the CW's photo identifications of him as suggestive and her visual identification as unreliable. According to the Second Circuit, "[w]hen objection is made to a pre-trial identification, an analysis of whether the witness may identify the defendant at trial generally involves a two-step inquiry." *United States v. Tortora*, 30 F.3d 334, 338 (2d Cir. 1994). First, the Court must determine whether the identification procedures "unduly and unnecessarily suggested that the defendant was the perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). If not, there is no due process obstacle to admissibility of a subsequent in-court identification, and the reliability of an eyewitness identification is then a matter left to the jury. *Id.* "If the court finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable." *Id.* So long as "(a) the procedures were not suggestive or (b) the identification has independent reliability," the identification evidence will be admissible, *id.*, which satisfies the concern in *Wade* that "the jury not hear eyewitness testimony unless that evidence has aspects of reliability," *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977).

**B. Analysis**

Schovanec contends that the CW's identifications were suggestive for two reasons. First, he points to the fact that the officers corrected her when she referred to him as "Tom." The CW and the officers testified as to the nickname each knew the Defendant by; Schovanec argues that by asking if the CW meant "Tone," the officers were suggesting to her that she change the name she used ("Tom") to accord with the name they knew him by ("Tone"). Second, the Defendant claims that the use of the photo array was improper because (1) the booking photographs were presented sequentially, not simultaneously, and too quickly for her to come to an independent conclusion; and (2) the photographs showed written identifying information about the subjects. In response, the Government argues that there is nothing suggestive in the "Tom"/"Tone" exchange, principally because the CW and the Defendant already knew each other at the time of the controlled purchases. In the Government's view, the confusion over whether the drug seller was known as "Tom" or "Tone" was simply a matter of clarifying what the person's name was—his identity was never in dispute. In addition, the Government urges that the evidence shows no suggestiveness in the informal manner by which the officers showed the booking photographs to the CW in the back of the police cruiser.

The testimony at the *Wade* hearing regarding the circumstances surrounding the CW's photo identifications was inconsistent in several respects. Specifically relevant to the suggestiveness analysis, the testifying officers gave conflicting accounts of how the CW was shown the photo array and whether identifying information on the photographs was covered or folded when shown to the CW. As to the "Tom"/"Tone" distinction, although the officers know the Defendant as "Tone" (presumably short for "Anthony," his given name), the CW

called him "Tom"—or at least something which sounded closer to "Tom" than "Tone"—both on the witness stand and on the audio recordings of the events in September 2007. By the Defendant's telling, this confusion over his name indicates that the officers were trying to steer the CW toward naming the Defendant as the suspect rather than allowing her to identify him via the photo arrays without undue influence.

Even supposing, however, that these grounds are sufficient to conclude that the CW's identifications resulted from suggestive processes, the evidence would still be admissible if reliable under the circumstances. A pre-trial identification should be excluded "only if the procedure that produced the identification [was] 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *United States v. Bautista*, 23 F.3d 726, 729 (2d Cir. 1994) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)). But an identification that was possibly the product of a suggestive process is still "admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability." *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir. 1991). As applied to the facts in this case, even if the process by which the CW identified the Defendant from the photo arrays was problematic, her out-of-court identifications of him will be admissible if they are independently reliable. In assessing whether an identification is sufficiently reliable, the Supreme Court has instructed that several factors are relevant, including

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200 (1972); *United States v. Mohammed*, 27 F.3d 815, 821 (2d Cir. 1994).

Schovanec contends that the identifications were unreliable because the police used an old photograph of him in the array shown to the CW; given that he was significantly heavier as of September 2007, he argues that it is improbable for him to have been identified on the basis of the photograph, and that the reference to him as "little" is nonsensical. The Defendant also disputes the extent to which he and the CW were familiar to each other. The Government responds that there is no reason to doubt the reliability of the identifications because of the preexisting relationship between the CW and the Defendant. And, according to the Government, the characterization of Schovanec as "little" was in reference to his height—based on the source, either 5'5" or 5'7"—not his weight.

Based on the evidence presented during the *Wade* hearing, the *Neil v. Biggers* considerations all point in favor of admitting the CW's identifications of the Defendant. First, she had ample opportunity to view and confirm the identity of the person who sold her drugs on the three days in September 2007. When she was greeted at the entrance to 34 Hickory Street on September 25, she stood directly in front of him, they recognized each other, and talked about her former boyfriend before completing the drug purchase; she then repeated the transaction twice over the next three days, each time interacting with and later identifying the same person. The Defendant contests that the CW was sufficiently familiar with him by making reference to their earlier encounter during the May 17 transaction, emphasizing the CW's statement that she "didn't recognize" him, which he claims should be taken to mean that the CW did not in fact recognize the then-heavier Schovanec when they met on May 17. This argument is strained for two reasons. First, in context, even if she momentarily did not recognize him, she certainly did shortly thereafter, as the recording demonstrates. Further, Defendant's argument neglects the reality that, in casual

conversation, people often use language in a non-literal manner. Thus, while it is true that the CW said to the Defendant, "I didn't recognize you . . . you got fat," the context of this exchange makes clear that she meant (and he interpreted her statement to mean) "I still recognize you even though you gained weight." Everything about the conversation indicates that the CW was speaking figuratively, not literally, and so, rather than suggest a problem with the CW's identification of the Defendant, this exchange further confirms that the two were familiar to each other on sight.

Second, the testimony of the CW and the audio recording evidence shows that the CW was paying close attention throughout the three drug transactions and was acutely aware of the people she encountered and her surroundings in general. Third, her description of the crack seller was more than just accurate. In *United States v. Mohammed*, the defendant challenged a witness's arrest-scene identification of him in connection with a carjacking. 27 F.3d at 821. Before identifying a man that the police had in custody as his assailant, the witness could describe him only as "a man from the black race." *Id.* at 822. But because only ten minutes had elapsed between the carjacking and the identification, the court found the identification independently reliable. *Id.* By comparison, the evidence of reliability in this case is even stronger: after the September 25 transaction, rather than describe the crack seller in generic terms, the CW volunteered his nickname even before being shown the photo array; she had no need to describe the Defendant's characteristics to the officers because she knew who he was, despite his added bulk, and so she used the name she knew him by rather than give a physical description.

Fourth, the CW was certain of her identifications both at the time she made them and during her testimony in court. Notwithstanding the extended discussion of the

Defendant's nickname—whether "Tone" or "Tom"—the evidence shows that the CW and the officers were confused, if at all, about his name, not his identity. As the CW mentioned several times during her testimony, she has just always called him "Tom" even though she knows others call him "Tone," a difference likely due to her accented English because she is Puerto Rican. Finally, only a few minutes passed between the drug sale crime the CW observed and her identification of the Defendant in the police vehicle nearby. *See, e.g.*, *Biggers*, 409 U.S. at 201 (crediting an witness's identification seven months after the crime was committed).

More generally, keeping in mind that the purpose of the inquiry is to make only a "threshold" determination of reliability, *Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir. 1998), the CW's identifications of the Defendant touch on few if any of the prototypical problems associated with eyewitness identification, such as encountering a stranger under stressful conditions, or having one's recollection distorted over time, *see Manson*, 423 U.S. at 112. In this case, the witness encountered someone she already knew personally, talked with him about someone else they both knew, named the person to police officers, and then confirmed his identity through a photo array. To confirm this, the witness repeated the relevant steps twice over the next three days, identifying the same person without hesitation. Therefore, even assuming without deciding that there was a suggestive process involved, the CW's identifications of the Defendant are sufficiently reliable to be heard by a jury.

**III.     Conclusion**

For these reasons, the Defendant's Motion to Suppress [Doc. # 29] is denied.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of April, 2008.